IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **FRANK G. DiNOTO, Individually and as Representative of All Persons Similarly Situated,** | § § § § | |
| **Plaintiffs,** | § § | **Civil Action No. 4:13-cv-2877** |
| **v.** | § § | **JUDGE KEITH P. ELLISON** |
| **UNITED SERVICES AUTOMOBILE ASSOCIATION, AND AUTO INJURY SOLUTIONS,** | § § § § | **JURY TRIAL** |
| **Defendants.** | § § | |

**PLAINTIFF'S FOURTH AMENDED COMPLAINT
AND PUTATIVE CLASS ACTION COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Frank DiNoto, Individually and as Representative of All Persons Similarly Situated, Plaintiff herein, complaining of United Services Automobile Association ("USAA"), and Auto Injury Solutions ("AIS"), Defendants, and files Plaintiff's Fourth Amended Complaint and Putative Class Action Complaint. For causes of action Plaintiff would show as follows:

## I. INTRODUCTION

1.1     This is a suit for money damages and declaratory relief on behalf of Plaintiff and all persons similarly situated (collectively referred to as the "Class" or "Plaintiffs") as a result of the Defendants' wrongful actions outlined below. Defendants USAA and AIS engage in a pattern of practice in which they automatically and routinely

deny and/or underpay properly submitted personal injury protection ("PIP") claims related to automobile accidents for no legitimate reason, or for reasons that are prohibited by statute.

## II.  PARTIES

2.1     Plaintiff is a resident of Harris County, Texas and may be served with notice through the undersigned attorney.

2.2     Defendant Auto Injury Solutions, Inc. is a foreign for-profit company doing business in the State of Texas. Auto Injury Solutions, Inc. AIS has been served and no citation is requested at this time.

2.3     Defendant, United Services Automobile Association, is a duly incorporated insurance company, authorized to do business in and doing business in the State of Texas. Defendant USAA has been served and no citation is requested at this time.

## III. JURISDICTION & VENUE

3.1     This court has exclusive jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C.A. §1441 (West), the CLASS ACTION FAIRNESS ACT of 2005. Defendants, in removing this action, provided the Court with evidentiary support concerning both the number of potential class claimants and large amount of "charges not paid in full for the claims described in Paragraph 7" that "was in excess of $5,000,000.00."[1] Accordingly, 28 U.S.C.A. §1441 applies.

---

[1] *USAA's Notice of Filing Declarations in Support of Removal*, Docket No. 2-1, pp. 3.

3.2     Venue is proper in the southern district of Texas, as many of the events that give rise to this action occurred in Harris County, Texas and throughout the southern district.

## IV. FACTS SPECIFIC TO DINOTO

### A.     *The policy of insurance at issue; insured-insurer relationship*

4.1     In 1992 Frank DiNoto purchased a policy of automobile insurance issued by USAA.  Mr. DiNoto qualified for auto insurance through USAA because he served his country as a Lieutenant in the Air Force.  A true and correct copy of the insurance policy as it existed at the time of the PIP claims at issue in this case is attached as Exhibit 1 (the "Policy").

4.2     The Policy included Personal Injury Protection Coverage or "PIP." *See* Ex. 1 (USAA-DiNoto at 000005).

4.3     The PIP provisions of the Policy are contained at pages 11 through 14 of the Policy. *See* Ex. 1 (USAA-DiNoto at 000020-000024).

4.4     In addition to the terms of the contract, the PIP provisions of the Policy issued to DiNoto are governed by TEXAS INSURANCE CODE §§1952.151—1952.161 (Subchapter D of Chapter 1952 of the TEXAS INSURANCE CODE).

4.5     DiNoto faithfully paid his premiums, including the premium charged for the PIP.

4.6     USAA accepted the premiums paid by DiNoto.

4.7     The Policy is a valid, enforceable contract between DiNoto and USAA.

4.8     The Policy was valid and in force at the time of the underlying accident on June 16, 2011 (the "Accident"), and at all relevant times since then.

4.9     The Accident is a covered cause of loss under the Policy, and Defendants have never disputed that the Accident is covered by DiNoto's PIP.

4.10    The Policy is an "insurance contract" as that term is commonly used in the law of insurance.

4.11    USAA is an "insurer" as that term is commonly used in the law of insurance with regard to the Policy.

4.12    On the date of the Accident, DiNoto was a "covered person" as that term is defined on Page 11 of 28 of the Policy (USAA-DiNoto at 000020).

4.13    On the date of the Accident, DiNoto was an "insured" as that term is commonly used in the law of insurance with regard to the Policy.

4.14    Frank DiNoto is a "person" as that term is defined by Section 541.002(2) of the TEXAS INSURANCE CODE as construed by *Ceshker v. Bankers Commercial Life Ins.*, 568 S.W.2d 128, 129 (Tex. 1978).

4.15    USAA is a "person" as that term is defined by Section 541.002(2) of the TEXAS INSURANCE CODE.

4.16    As reflected in the Policy, DiNoto's PIP coverage limit was $100,000 at the time of the Accident.

4.17    USAA is required to pay benefits in accordance with the TEXAS INSURANCE CODE provisions governing PIP and the Policy language.  Under the TEXAS INSURANCE CODE:

_____

[P]ersonal injury protection consists of provisions of an automobile liability insurance policy that provide for payment to the named insured in the policy…all reasonable expenses that: (1) arise from an accident; (2) are incurred not later than the third anniversary of the date of the accident; and (3) are for:

(A)   necessary medical, surgical, x-ray, or dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing or funeral services;

(B)   in the case of an income producer, replacement of income lost as a result of the accident.

TEX. INS. CODE §1952.151.

4.18   Additionally, PIP benefits are "payable without regard to: (1) the fault or nonfault of the named insured or recipient in causing or contributing to the accident; and (2) any collateral source of medical, hospital, or wage continuation benefits." TEX. INS. CODE §1952.155.

4.19    Under the Policy, DiNoto was entitled to recover his reasonable medical expenses and work loss benefits.

4.20   For medical benefits, USAA is contractually required to pay "**reasonable fees for medical necessary and appropriate service**." (USAA-DiNoto-000021) "Medically necessary and appropriate services means necessary medical, surgical, X-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services." (USAA-DiNoto-000039). The Policy excludes

PIP benefits for treatment that is not consistent with the insured's injuries or conditions, published guidelines or standards of care, or which is excessive. (USAA-DiNoto 000040). The Policy also specifically states "medically necessary and appropriate medical services" do not include things like nutritional supplements, over-the-counter drugs, or experimental treatments that are not at issue in this case. *Id*.

4.21   The Policy also defines the reasonable fee that is required to be paid by USAA for the medically necessary and appropriate services: "Reasonable fee means the amount as determined by us or someone on our behalf, which we will pay for charges made by a licensed hospital, licensed physician, or other licensed medical provider for medically necessary and appropriate medical services. We will pay the lesser of: 1) the actual charge; 2) the charge negotiated with a provider; or 3) the charge determined by a statistically valid database that is designed to reflect charges…in the same or similar geographic region." Per the Policy, USAA must pay the lesser of one of these 3 amounts once proof of medically necessary and appropriate services have been submitted. (USAA-DiNoto 000021).

4.22   For work loss benefits, USAA is contractually required to pay "eighty percent of a covered person's loss of income from employment. These benefits apply only if, at the time of the accident, the covered person was an income producer and was in an occupational status." (USAA-DiNoto 000040). Loss of income is the difference between income which would have been earned had the covered person not been injured and the amount of income actually received from employment during the disability. *Id*. **The Texas Amendatory Endorsement modified the Policy to eliminate the**

**requirement that the insured show income actually lost or that he or she was totally disabled as a result of the wreck**.

4.23    (USAA-DiNoto 0000039-000040)

**B.      *The Accident giving rise to Plaintiff's insurance claim***

4.24    On June 16, 2011, DiNoto was driving in Houston, Texas when another driver ran a red light and struck his vehicle.

4.25    The force of the impact caused DiNoto's vehicle to flip over in the intersection.

4.26    DiNoto was knocked unconscious in the crash. He was left hanging, suspended in the air by his seatbelt, while bystanders desperately tried to get him out of the truck before it caught fire and burned with him trapped inside.

4.27    DiNoto suffered the following injuries as a result of the crash (as documented in Emergency Room and hospital records):

- Scalp lacerations, abrasions and crushed scalp (including foreign bodies embedded in the scalp).
- Loss of consciousness
- Loss of memory
- Posttraumatic sub-arachnoid hemorrhage
- Interhemispheric subdural hematoma
- Headaches
- Vertigo
- Bone marrow contusions along the thoracic vertebral bodies
- Tinnitus
- Shoulder and neck pain
- Post-concussion syndrome
- Abrasions to hip region

4.28    DiNoto's traumatic injuries required him to be placed in ICU and hospitalized for 10 days.

4.29    DiNoto required extensive follow-up care, including treatment for the traumatic brain injury sustained in the Accident.

**C.    *Submission and initial handling of the PIP claim and Memorial Hermann Hospital Bill.***

4.30    USAA first became aware of the crash when it was reported to them by DiNoto's daughter, Lori Ratcliffe.

4.31    USAA created a loss report and a file. (USAA-DiNoto-000123).

4.32    On June 17, 2011, USAA sent a letter to DiNoto including PIP and Medical Payments ("Med Pay") coverage forms.

4.33    On June 20, 2011, a USAA adjuster contacted Ms. Ratcliffe and learned that DiNoto remained in the hospital in the ICU. (USAA-DiNoto-000121).

4.34    Also on June 20, 2011, USAA received a voicemail from Mrs. DiNoto advising that DiNoto was not at fault in the crash, that he was "nearly killed," that DiNoto had been transported to the Herman Memorial hospital Emergency Room, had spent the weekend in the trauma unit, and was being monitored by a neurologist and a dermatologist. (USAA-DiNoto-000120)

4.35    On June 21, 2011, USAA determined that DiNoto had prior losses, but that they were not relevant. (USAA-DiNoto-000119 to 000120).

4.36    On June 21, 2011, USAA's adjuster sent a message to an examiner manager noting that there was a strong chance of underinsured motorist exposure. (USAA-DiNoto-000119). That is, the adjuster indicated that the tortfeasor's insurance would likely be insufficient to cover amount of damages sustained by DiNoto.

4.37   On June 23, 2011, USAA set reserves at $10,000 for PIP and $5,000 for Med Pay. (USAA-DiNoto-000117).

4.38   On June 24, 2011, the USAA adjuster summarized USAA's investigation in the claim file, noting that DiNoto was still in the hospital, that future treatment was unknown, that future medical billing was "pssbly [sic] over $100k, [insured driver] still in icu [sic]" and that the authority requested was $100,000 under the PIP provision of the policy.  (USAA-DiNoto-000116 to 000117).

4.39   On June 24, 2011, USAA requested the Texas Peace Officer's Crash Report. (USAA-DiNoto-000115).

4.40   On June 29, 2011, DiNoto called USAA and USAA interviewed him to learn (1) about his consulting company and the two jobs lost due to the crash, (2) that he was released from the hospital hurting all over, (3) that he had upcoming medical treatment scheduled including CT scan, and (4) that he has health insurance through Medicare and Blue Cross Blue Shield. (USAA-DiNoto-000112).

4.41   USAA PIP adjuster Christy Gawlik learned in this June 29, 2011 interview that DiNoto had Medicare and insurance, and so she "set expectations for the loss also – medicare w/this amt of bills, may take awhile to get resolved[.]" (USAA-DiNoto-000112).

4.42   On July 1, 2011, the USAA PIP adjuster was granted $100,000 of authority under the PIP provisions and $5,000 under Med Pay. (USAA-DiNoto-000112).

4.43   On July 6, 2011, USAA's adjuster learned from the at-fault adjuster that DiNoto had "significant" injuries. The at-fault adjuster advised that the limits of liability

on the adverse policy were $30,000 per person and $60,000 per incident. The USAA adjuster noted, "we will have a uim exposure." (USAA-DiNoto-000110).

4.44   Also on July 6, 2011, USAA received a copy of the Texas Peace Officer's Crash report, which showed that DiNoto had been involved in the crash and sustained incapacitating injuries resulting in his transport to Memorial Hermann Hospital by Cy-Fair EMS. (USAA-DiNoto-000140 to 000147).

4.45   On August 10, 2011, Ms. Gawlik advised DiNoto to send the hospital bill to GEICO - the at fault driver's carrier.  (USAA-DiNoto-000105).

4.46   On August 27, 2011, USAA PIP adjuster Gawlik, represented that DiNoto's PIP coverage "will pay bills as you receive them..." (USAA-DiNoto-000391).

4.47   On September 12, 2011, DiNoto's counsel sent USAA a letter of representation.  (USAA-DiNoto-000376).

4.48   On September 13, 2011, USAA responded with a form letter requesting "documentation about the case as it becomes available" and requested correspondence be sent to Defendant Auto Injury Solutions ("AIS").

4.49   On September 19, 2011, USAA requested that "Patti" (upon information and belief this is Patricia Ann Baratin, a USAA or AIS employee) contact DiNoto's counsel and get the status on the bills. USAA also begins considering collateral sources as a way to avoid payment.  Specifically, "Patti" was instructed to ask if DiNoto's medical bills had been submitted to health insurance or Medicare. (USAA-DiNoto-000101).

4.50   On September 30, 2013, USAA received a letter from DiNoto's health insurer Blue Cross Blue Shield ("BCBS") informing USAA that BCBS was paying medical bills and would seek reimbursement. Patricia Baratin, now the adjuster on the file, called DiNoto's attorney's office and was advised to send all PIP payments to the attorney's office. (USAA-DiNoto-000100 to 000101).

4.51   Also on September 30, 2011, USAA sent a letter stating it needed the following information to "process" DiNoto's PIP claim: (1) itemized billings to include CPT and ICD-9 codes; (2) tax identification numbers of the providers; and (3) the physical address where the treatment occurred. (USAA-DiNoto-000379).

4.52   On October 17, 2011, DiNoto provides billing records from Memorial Hermann Hospital. (USAA-DiNoto-005227). The billing material included the information requested by USAA including procedure and diagnosis codes. (*e.g.* USAA-DiNoto-005228). The billing record clearly showed DiNoto's injuries resulted from a motor vehicle collision; that DiNoto was the driver; and that the crash occurred on a street of highway. *Id.* The total charges of the health care provider were $55,939.30. (USAA-DiNoto-005237).

4.53   On October 18, 2011, USAA finally reviewed the police report that it has had since July. (USAA-DiNoto-000099).

4.54   Upon information and belief, on or before October 20, 2011 USAA reviewed the medical bills provided by DiNoto on October 17, 2011. USAA prepared an "explanation of reimbursement" ("EOR") that indicated that USAA would reimburse **$0.00** of the $55,939.30 incurred by its insured. (USAA-DiNoto-005470 to 005486). The

EOR indicates that the reason for refusal was either that the charges were "duplicate" or that the bill does not include two or more of: (1) ICD-9 codes; (2) CPT Codes; (3) Dates of Service; (4) Provider TIN; (5) Service Provider Name; (6) Service provider address. *Id.*

4.55   On or before October 27, 2011, USAA prepared another EOR pertaining to the Memorial Hermann billing records. (USAA-DiNoto-006538 to 006541). This EOR identifies the ICD-9 (diagnosis) codes that were part of the Memorial Hermann bills provided to USAA. (USAA-DiNoto-006538). USAA no longer indicated that the billing charges were duplicative, or that it needed the six information items described in the first EOR (USAA-DiNoto-005470 to 005486). Instead, USAA stated it could not pay benefits because it needed "documentation … to substantiate the relatedness of the treatment to the injury diagnosis for this loss." (USAA-DiNoto-006540). The ICD-9 codes contained in *the letter itself* show the treatment resulted from a motor vehicle crash. (*see* ICD-9 E812.0 appearing at USAA-DiNoto-006538, showing DiNoto's treatment was the result of a motor vehicle collision in which he was a driver). The codes also identify the place of the injury as "street & highway." (*see* ICD-9 E849.5 appearing at USAA-DiNoto-006538).  Other codes identify DiNoto suffering an "open wound" and "acute pain due to trauma." (USAA-DiNoto-006538).

4.56   On November 4, 2011 a USAA manager reviews the file and notes that USAA needs medical status updates, treatment protocols, and photos. Once these items are obtained USAA "may want to take to serious injury for review and discussion." (USAA-DiNoto-000097). The manager also notes that BCBS is paying DiNoto's medical

bills, thereby showing USAA is considering collateral sources of payment. (USAA-DiNoto-000097). All of this occurs after the October 27, 2011 EOR was sent to DiNoto advising that USAA could not provide PIP benefits for his hospital stay because it could not "substantiate the relatedness of the treatment to the injury diagnosis for this loss" *but before* any additional documents were received by USAA. This pattern of premature denial prior to investigation occurs repeatedly.

4.57   Upon information and belief, on November 15, 2011, Patricia Baratin reported to USAA that BCBS was paying DiNoto's medical bills and that DiNoto's attorney requested all payments go to the attorney's office. Thereafter, on November 15, 2011 Patricia Baratin was instructed to check back with BCBS to see how much they had paid out. (USAA-DiNoto-000097).

4.58   Also on November 15, 2011, USAA issued a PIP payment check to DiNoto and his attorney in the amount of $ 2,228.55. (USAA-DiNoto-000097). This check was for the exact amount billed by the EMS provider and an "Explanation of Reimbursement" identified that the check was being issued to reimburse DiNoto for that bill.

4.59   On November 22, 2011, USAA sends a "second notice" requesting documentation to Memorial Hermann, stating that it cannot make a reimbursement decision because it needs documentation of the relatedness of the treatment to the injury sustained. (USAA-DiNoto-005380 to 005381). Again, the ICD-9 diagnostic codes showing the treatment is the result of a motor vehicle crash are contained in *the letter itself*.   Moreover, USAA had just one week earlier reimbursed Mr. DiNoto for the EMS bill generated by the ride from the scene of the crash to Memorial Hermann.  USAA (and

upon information and belief, Patricia Baratin) sends another yet notice with the same statements on December 22, 2011 as well (USAA-DiNoto-005388 to 5390) after it had received even more information as detailed below.

4.60   On December 9, 2011, USAA **closed Mr. DiNoto's PIP claim because "[insured] filing all bills thru [sic] BCBS[.]"** (emphasis added) (USAA-DiNoto-000096). USAA would wait for a subrogation demand—that is a request for payment under DiNoto's PIP by some other collateral payer such as health insurance or Medicare—and the PIP claim would be reviewed and reopened *if necessary. Id.* Once again, USAA is considering collateral sources of payment and using this as a reason to deny PIP benefits. USAA also did not advise DiNoto or his counsel that it was closing his PIP claim. Instead, *the same day USAA closed Mr. DiNoto's PIP claim*, Ms. Baratin sent DiNoto a request for the medical records associated with his Memorial Hermann treatment.

4.61   On January 12, 2012, in response to USAA's December 9, 2011 letter, DiNoto sends USAA the Memorial Hermann medical records. (USAA-DiNoto-005243-005245).

4.62   On January 21, 2011 USAA sends DiNoto's attorney a "Final Notice" letter stating in reference to the Memorial Hermann bills "the item is withdrawn from consideration due to failure to submit the requested material. (USAA-DiNoto-005397). USAA once again says it needs documentation to substantiate the relatedness of the treatment to the loss. (USAA-DiNoto-005399). At this time, USAA has the Memorial Hermann medical records showing he was hospitalized for 10 days following a serious

rollover car crash and detailing the treatment and diagnoses in detail, as well as the hospital billing records with ICD-9 codes linking DiNoto's injuries to a motor vehicle accident.

4.63   On January 25, 2012, DiNoto's attorney responded to USAA's Final Notice letter by pointing out that the medical records previously submitted "clearly show DiNoto's treatment was the result of a car accident." Mr. DiNoto's attorney also provided a courtesy copy of the police report.

4.64   On January 27, 2012, USAA creates a letter titled "Adjustment" with "Patient Copy" in the heading. (USAA-DiNoto-005406 to 005413). In this document, USAA states that it will allocate a PIP payment of $47,548.41 to DiNoto for medical bills arising from his hospitalization. (USAA-DiNoto 005407). USAA states the service provider (Memorial Hermann) has agreed to accept this amount as payment in full for the services provided. (USAA-DiNoto-005412). Moreover, "this reimbursement amount is based on an agreement between service and the USAA audit vendor or other entity which has contracted with that vendor." *Id*. This "charge negotiated with a provider" represents the "reasonable fee" USAA was required to pay per the terms of the Policy. (USAA-DiNoto-000021).

4.65   On January 28, 2012, USAA adjuster Ms. Baratin requested the $47,548.41 be made to payable to DiNoto and his attorney. (USAA-DiNoto-000095). Two days later, on January 30, 2012 USAA rejected Ms. Baratin's payment request and no payment was issued. *Id*. A note was placed in the claim file by (upon information and belief) a USAA

manager stating that there "is BCBS lien and medicare lien on this file." *Id.* This is not a permissible reason for refusing a payment required by the plain language of the Policy.

4.66    On February 10, 2012, DiNoto's counsel sent a letter advising USAA that it appeared that USAA was failing to exercise its duties of good faith and fair dealing with its insured.

4.67    On February 24, 2012 a USAA adjuster (upon information and belief, Patricia Ann Baratin) called DiNoto's attorney's office and stated that payment of the Memorial Hermann bill could not be made because Medicare had already paid that bill. Moreover, the adjuster indicated that USAA had received a Medicare lien and asked whether payment should be sent to DiNoto's attorney or Medicare. (USAA-DiNoto-000093 to 000094). The same day, USAA generated another "Adjustment" stating USAA would reimburse **$0.00** for DiNoto's Memorial Hermann bill because "reimbursement for the service provided was settled and/or negotiated with the patient, provider for their representative and not additional payments are owed." (USAA-DiNoto-0005414 to 005417).

4.68    Also on February 24, 2012, Ms. Baratin sent a letter in response to DiNoto's claims for PIP benefits. (USAA-DiNoto-000428 to 000429).    The letter includes a discussion of *Haygood v. de Escobedo*, a Texas Supreme Court decision interpreting the TEXAS CIVIL PRACTICE AND REMEDIES CODE §41.0105. *Id.* The letter recites that "USAA acknowledges that CPRC 41.01 does not expressly apply to PIP benefits [.]" *Id.*    Nevertheless, the letter goes on to state that Medicare has made payments and that USAA owes "only the amount paid by Medicare." *Id.*

4.69    Despite agreeing that USAA "owes the amount paid by Medicare" and its prior representations that amounts owed to Medicare would be paid to DiNoto and his attorney, no payment of PIP benefits was enclosed with this letter. To date, these undisputed benefits have never been paid to DiNoto.

4.70    On February 28, 2012, Ms. Baratin called DiNoto's counsel and again stated that USAA would not pay the hospital bill because Medicare had paid it. (USAA-DiNoto-000091).

4.71    On February 29, 2012, USAA (upon information and belief, specifically Ms. Baratin) sent DiNoto another "Adjustment" indicating that the Memorial Hermann bill would not be reimbursed because "payment for reimbursed amount was mailed separately to the patient or their representative" and "reimbursement for the services provided was settled and/or negotiated with the patient provider for their representative and no additional payments are owed." (USAA-DiNoto-0005238-5242). These reimbursements were never mailed separately to DiNoto or his representative.

**D.     USAA repeatedly requests information it already has, is not required under Texas law or the Policy, or does not need.**

4.72    Upon information and belief, from sometime before March 27, 2012 through April 25, 2012, USAA reviewed physician-billing records from UT Physicians. These reviews resulted in a series of "information requests" indicating that USAA could not provide reimbursement because it lacked "CPT or other acceptable codes" for Drs. Sam Luber, Alexander Simonetta, Scott Shepherd, and Richard Nahoura. (USAA-DiNoto-006624 to 006627). Additional letters about these four providers were sent in

April and May 2012. (USAA-DiNoto-006648, 006666, 006649, 006667, 006650, 00668, 006651, and 006669).

4.73    All four of these doctors treated DiNoto during his lengthy hospitalization at Memorial Hermann following the accident. USAA refused reimbursement for these doctors' bills in part on the grounds that it did not have "CPT or other acceptable diagnostic codes." (USAA-DiNoto-006624-006627). However, all four of these doctors treated DiNoto in the hospital and all of the diagnosis and procedure codes for the hospital stay correspond to their prescribed care. Thus, the diagnosis and treatment by these physicians was previously provided to USAA in October 2011 when USAA received the Memorial Hermann billing records. (USAA-DiNoto-005227 to 005237). USAA knew that these were hospital physicians because its own Requests for Information note that the dates of service included June 16 or June 17, 2011, which were days USAA knew DiNoto was hospitalized.

4.74    On December 28, 2012, DiNoto's counsel provided a comprehensive PIP claim letter. The letter included DiNoto's medical and bills to date resulting from the crash, as well as documentation supporting his substantial lost income claim. The medical bills totaled **$136,853.89** and the claim for lost wages **$147,750.00**. (USAA-DiNoto-0004711).

4.75    A week before sending the comprehensive PIP letter, on December 20, 2012, DiNoto's attorney also sent USAA a request for UIM evaluation that included detailed information about the crash, DiNoto's injuries, his medical bills, lost wages, and ongoing condition. (USAA-DiNoto-000449 to 001348). Included with the letter were

copies of the medical records and bills, including Memorial Hermann's records and bills, UT Physicians, Livingston Plastic Surgery, Texas ENT Specialists, PA, St. Luke's The Woodlands Hospital, Woodlands Sports Medicine Center, Larry Pollack, Ph.D. & Associates, and others. *Id.*

4.76   Over the three months following these submissions, USAA and its adjusters would send dozens of letters denying payment or requesting information that USAA already had in order to avoid responsibility for any of these medical bills or lost wages. In fact, although DiNoto's PIP claim was for over $200,000.00, USAA would pay only an additional **$131.27** to DiNoto.

4.77   On January 5, 2013, USAA's new PIP adjuster Jose Luis Garcia prepared an EOR concerning bills from Advanced Diagnostics. (USAA-DiNoto-006564 to 006565).   USAA refused reimbursement because "Box 10, Question 8 of the CMS1500 form indicates treatment rendered is not related to an auto accident." *Id.* The EOR itself notes that the ICD-9 codes associated with the treatment included E812.9 (Other motor vehicle collision with motor vehicle). *Id.* Moreover the record itself describes the chief complaint as "Multiple injuries rollover automobile accident" and lists a history of "...male who sustained injuries in a motor vehicle accident... [h]e continues to have neck pain..." (USAA-DiNoto-006561).

4.78   On January 7, 2013 and again January 11, 2013, Mr. Garcia sent a request for information for (1) ICD-9 codes, (2) service and billing provider's name, (3) provider's federal tax ID number, (4) and the physical location of the service for Andrew Chang at Singleton Associates. (USAA-DiNoto-006633 to 006634). On January 9, 2013

and January 25, 2013, the adjuster sent a request for ICD-9 codes only to Dr. Baskaran and Dr. Seipel, two other providers at Singleton Associates. (USAA-DiNoto-006636) (USAA-DiNoto-006635). Mr. Garcia sent a second request to Dr. Seipel on February 20, 2013 (USAA-DiNoto-006658) and a third on March 22, 2013. (USAA-DiNoto-006676). On February 4, 2013, Mr. Garcia sent a second request to Dr. Baskaran with Singleton indicating USAA lacked ICD-9 codes. On February 6, 2013, Mr. Garcia sent a second request to Andrew Chang, requesting the same information identified above. (USAA-DoNoto-006657) and a third request on March 8, 2013 (USAA-DiNoto-006675).

4.79    The Singleton Associates billing records provided by DiNoto's counsel to USAA on December 28, 2012 contained the provider's names, and procedure codes as well as actual descriptions of the procedures done. (USAA-DiNoto-003239 to 3244). The findings and impressions of the radiologists appear in the records of each imaging study. (*See e.g.* USAA-DiNoto-003259). The reports clearly show where the studies were done. (*See e.g.* USAA-DiNoto-003245 to 003286). Therefore, USAA's repeated requests for this information were needless and could only have been for the purpose of delaying payment.

4.80    On January 7, 2013, Mr. Garcia sent provider Brian Johnston a request for service and billing provider's name, federal tax ID number, and physical address. (USAA-DiNoto-005005). This information had already been provided to USAA one year earlier. (USAA-DiNoto-005243 to 005244).

4.81    Between January 7 and January 11, 2013, Mr. Garcia sent eight information requests to UT Physicians doctors who saw DiNoto in the hospital asking for the service

provider's name, federal tax ID number, and physical address where the services were provided. (USAA-DiNoto-00006639, 006641 to 006646). USAA already had this information when it sent the requests. (*See* USAA-DiNoto-000474, 000485). As to one other physician, the requested information was ICD-9 codes. (USAA-DiNoto-006640). USAA had ICD-9 codes for Mr. DiNoto's hospital stay since October 2011. (USAA-DiNoto-006538).

4.82   Second requests for the same information were sent between February 4 and February 6, 2013 to some of these providers. (USAA-DiNoto-006661 to 006664). Third requests were sent in early March 2013. (USAA-DiNoto-006679 to 006682, 006684).   Again, USAA already had this information when it was sending these requests and could only have been doing so for the purposes of delaying payment.

4.83   On January 9, 2013, USAA sent a request for information to provider Larry Pollock, seeking CPT code, ICD-9 code, service and billing provider's name, federal tax ID number, and the physical location where services were provided. (USAA-DiNoto 006637). USAA already knew this provider's name and address when it sent the request, which we know because it appears on the information request. *Id.* Dr. Pollock's diagnoses and CPT codes, as well as the result of his neuropsychological testing and evaluation supporting his diagnoses, are also contained in his report, which DiNoto's counsel provided to USAA in December 2012.   (*See* USAA-DiNoto-000663 to 000706, *esp.* 000706).

4.84   On February 4, 2013, Jose Luis Garcia sent a Second Request to Dr. Pollock for the same information that USAA already had. (USAA-DiNoto-006660). On

March 6, 2013, he sent a Third Request for the same information. (USAA-DiNoto-006678).

4.85    On January 7 and 10, 2013, Mr. Garcia sent an EOR to DiNoto concerning Dr. Jeff Chimenti's bill of $1,444.00. (USAA-DiNoto-006577-006579; 005333-005337). USAA refused reimbursement because the "medical bill submitted does not include two or more of the following: ICD-9 Codes, CPT Codes, Itemized charge amounts for each CPT Code, Dates of Service, Provider TIN, Service Provider Name, Service Provider Address." *Id.* On February 6, 2013, Mr. Garcia sent a "Documentation Request" to Dr. Chimenti asking for the same information. (USAA-DiNoto-005385-005387). A third request for the same information was sent March 8, 2013. (USAA-DiNoto-005394 to 005396).

4.86    Dr. Chimenti's records (USAA-DiNoto-000550 to 000594) **contain every single data point** Mr. Garcia claimed was absent except the tax ID number: the ICD-9 codes (USAA-DiNoto-000555 and 000558), CPT Codes (USAA-DiNoto-000551 to 000552), charges itemized by CPT code (*id.*), the dates of service (*id.*), the provider's name (*id.*), and the provider's address (USAA-DiNoto-000563 to 000565). USAA had all of this information in December 2012. Moreover, it is unclear why USAA needs any provider's tax ID when PIP payments are supposed to be made to the insured pursuant to Texas law and the Policy.

4.87    On January 11, 2013, Mr. Garcia sent information requests to Dr. Shepard Scott, Dr. Bryan Oh, and Linsey Mitchel with Mischner Neuroscience seeking ICD-9 codes, service and billing provider name, federal tax ID number, and physical address.

(USAA-DiNoto-006630 to 006632). On February 6, 2013, Mr. Garcia sent second requests for this same information. (USAA-DiNoto-006654 to 006656).

4.88   Mischner's Neuroscience's records were provided to USAA in December 2012 and contain the ICD-9 codes (*e.g.* USAA-DiNoto-000792, 000797), as well as the providers' names and physical address (USAA-DiNoto-000773 to 000774; and 000776 to 000799).

4.89   On January 18, 2013, Mr. Garcia sent an EOR to DiNoto concerning Dr. Christopher Livingston's bill. (USAA-DiNoto-006567 to 006569). USAA refused payment because the "medical bill submitted does not include two or more of the following: ICD-9 Codes, CPT Codes, Itemized charge amounts for each CPT Code, Dates of Service, Provider TIN, Service Provider Name, Service Provider Address." *Id.* On January 25, 2013, Mr. Garcia created an "Adjustment" to this EOR, which added only the word "MEDICARE" to the reason that no payment was being made. On March 22, 2013, he sent a third request for this same information. (USAA-DiNoto-005391 to 005393).

4.90   Dr. Livingston's records (USAA-DiNoto-000531 to 000549) contain **every single data point** Mr. Garcia claimed was absent except the tax ID number: the ICD-9 codes (USAA-DiNoto-000543), CPT Codes (USAA-DiNoto-000531 to 000532), charges itemized by CPT code (*id.*), the dates of service (*id.*), the provider's name (*id.*), and the provider's address (USAA-DiNoto-000537). Again, USAA has no basis for requiring its insured to provide medical providers' tax ID numbers.

4.91   Despite these numerous requests for ICD-9 codes, upon information and belief, Defendants knew very well what DiNoto's injuries were, and how they occurred. In addition to the more than adequate records provided to USAA by DiNoto and his counsel, on January 7, 2013, USAA employed a nurse to review DiNoto's medical records. (USAA-DiNoto-001393 to 001408). The review notes confirm DiNoto was seriously injured in an automobile crash resulting in a rollover. *Id.*   The nurse states that it is reasonable to conclude that DiNoto suffered sub-arachnoid hemorrhages, scalp laceration, and neck and shoulder injuries in the crash. *Id.* The EMS treatment, ER treatment, hospital admission between June 16 and June 25, 2011, and all treatment relating to Dr. Livingston were "medically necessary and related to the MVA of June 16, 2011." *Id.* As to DiNoto's brain injury and the orthopedic injuries, the nurse defers to physicians and experts. *Id.*

4.92   Moreover, on January 11, 2013, Mr. Garcia, the USAA adjuster who would send dozens of requests claiming he did not know about DiNoto's injuries, identifies "actual" diagnoses with ICD-9 codes in his request for authority. (USAA-DiNoto-000082 to 000083). Mr. Garcia also notes on this date the mechanism of injury, that DiNoto has no prior injury claims, and describes the injuries and harms DiNoto suffered. *Id.*

   **E.**      ***USAA's misrepresentations with respect to Medicare.***

4.93   On January 9, 2012, USAA PIP adjuster Patricia Baratin writes a letter to the Medicare MSPRC, the agency tasked with recovering Medicare conditional payments (sometimes known as a "Medicare lien") to "acknowledge" Medicare's interest in the PIP and Medical Payment coverages available to DiNoto. USAA advises Medicare that

DiNoto has requested PIP payments be made to DiNoto and his attorney.  USAA informs Medicare that due to the contractual relationship between USAA and DiNoto, USAA will be making the PIP proceeds payable as per the policyholder's request. USAA then directs Medicare to contact DiNoto for further inquiries. A copy of this letter is sent to DiNoto via his attorneys. (USAA-DiNoto-000404).

    4.94   On April 25, 2012, DiNoto's counsel contacted USAA and requested that they not issue payment to Medicare. (USAA-DiNoto-000090). The purpose of this was so that DiNoto's attorney could negotiate a reduction of the Medicare lien and thereby provide the difference to DiNoto so that he could pay off additional medical bills. Nevertheless, on or about June 19, 2012, USAA issued a check to Medicare (payable to "MSPRC") for **$12,860.96**. Neither DiNoto nor his attorney's name was included on the check. This was in direct contradiction to what USAA told Medicare as well as DiNoto.

    4.95   On February 6, 2013, USAA PIP adjuster Jose Luis Garcia sent DiNoto an EOR concerning Woodlands Sports Medicine PT. (USAA-DiNoto-006607 to 006612). Mr. Garcia refused reimbursement because "medical billing for this date of service should be sent to the following as it is the primary insurance company for this loss: MEDICARE." *Id.* On January 6, 2012, Medicare sent USAA a letter telling the company Medicare was secondary and USAA was primary. (USAA-DiNoto-000411).  As represented in USAA's briefing, USAA is aware that Medicare is not primary, but a secondary payer and this is a blatant misrepresentation to its own insured.

    4.96   On March 7, 2013, Mr. Garcia prepared an EOR for part of Dr. Christopher Livingston's billing that drops its previous false contention that the billing provided did

not contain sufficient information. Instead, USAA refuses reimbursement on the grounds that DiNoto must submit the bill to the primary payer: Medicare. (USAA-DiNoto-005821 to 005822). The EOR is sent to DiNoto on March 9, 2013. (USAA-DiNoto-006613 to 006616). Again, USAA was making a knowingly false statement about the law in order to avoid making a payment in accordance with the Policy.

4.97   On January 22, 2013, Mr. Garcia sends DiNoto an EOR concerning medical bills of Woodlands Sports Medicine and Jud Hees. (USAA-DiNoto-006570 to 006576). USAA refuses reimbursement because "medical billing for this date of service should be sent to the following as it is the primary insurance company for this loss: MEDICARE." *Id.*

4.98   On January 9, 2013, a USAA adjuster, identification number "CE8-05317-00029," prepared an EOR for a bill from UT physicians ("Dr. S. Che"). (USAA-DiNoto 005572 to 005575). The EOR considered a bill of $944.00 and appeared to "allow" a payment of $655.70, with the difference due to a reduction associated with the provider's participation in something called "Three Rivers Provider Network." *Id.* Likewise, an EOR from the same date by USAA adjuster ID no. "CEJ-7265 777H9" allows $32.00 on a $40.00 UT Physicians bill for "Dr. J. Lin." (USAA-DiNoto-005717 to 005718). Someone identified as "CW" entered a request for $624.00 of authority and $32.00 PIP payment to be issued to DiNoto and his attorney for medical expenses. (USAA-DiNoto-000085 to 000086). However, the payment was voided by "JLG" and/or "JG." (upon information and belief, Mr. Jose Garcia) because the PIP payment "HAS BEEN ADDRESSED UNDER MEDICARE LIEN." (USAA-DiNoto-000083 to 000084).

Following this, Mr. Garcia prepared his own EOR for the Dr. J. Lin bill. (USAA-DiNoto-005723 to 005724).  This EOR refused reimbursement because "payment for reimbursed amount was mailed separately to the patient or their representative" and "Medical billing for this date of service should be sent to Medicare as it is the primary insurance company for this loss." *Id.* DiNoto and his attorney never received any reimbursement for this bill.

4.99   On January 11, 2013, an EOR prepared by Mr. Garcia for UT physicians ("Dr. A. Sim") refused reimbursement because "medical billing for this date of service should be sent to Medicare as it is the primary insurance company for this loss." (USAA-DiNoto-005576 to 005577). The same was done in an EOR on January 12, 2013 concerning "Dr. S. Che" (USAA-DiNoto 006580 to 006582).

4.100  Likewise, on January 11, 2013 Mr. Garcia prepared an EOR concerning "Dr. B. Gil" at UT Physicians, which refused payment because "payment for reimbursed amount was mailed separately to the patient or their representative" and "medical billing for this date of service should be sent to Medicare as it is the primary insurance company for this loss." (USAA-DiNoto-005781 to 005782). Neither one of these statements was true. The next day, Mr. Garcia prepared another EOR for the same bill, again allowing $0.00 for the same reasons. (USAA-DiNoto-006601 to 006602).

4.101  On January 14, 2013, Mr. Garcia prepared an EOR for Dr. Lubner's bills, allowing $0.00. (USAA-DiNoto-005663 to 005664). The reason given was that medical billing should be sent to the primary insurance company for the loss: "MEDICARE." *Id.*

4.102  On January 16, 17, and 21, 2013, Mr. Garcia prepared substantially identical EORs concerning different UT Physicians' providers and DiNoto's physical

therapy provider. (*See* USAA-DiNoto-005636 to 005637, and 005808 to 005809); (USAA-DiNoto-006604 to 006605);(USAA-DiNoto-005538 to 005544). Each of these EORs identify the "primary insurance carrier for this loss: MEDICARE." *Id.*

4.103  Again, all of these statements are knowing misrepresentations of the law by USAA.

### F.     *Plaintiff's Lost Income Claim*

4.104  In addition to medical claims, DiNoto submitted a claim for lost income due to his injuries. (USAA-DiNoto-00449 to 000460). DiNoto lost over $100,000 in consulting work as a result of the wreck. As discussed above, DiNoto supplied USAA with medical records and reports documenting his serious and debilitating injuries as well as letters from employers for whom DiNoto performed consulting work. DiNoto also supplied tax records to USAA as part of his UIM claim, which further documented his earnings.  Despite this, USAA has consistently and continually refused to even consider DiNoto's substantial lost income claim. DiNoto, a high wage earner, purchased substantial PIP and UIM coverage to ensure he could meet his financial obligations in the event of serious injury.

### G.     *Summary of the Facts*

4.105  DiNoto, through his attorney, timely notified USAA of his PIP claim and was assigned claim number 010391849-22. Shortly thereafter, DiNoto's counsel submitted his medical bills and records relating to his injuries the Accident. DiNoto's medical expenses totaled $136,853, and DiNoto's total lost wage claim is $147,750. USAA acknowledged receiving these bills and records, yet only paid DiNoto $2,506.02

in PIP benefits, despite setting reserves for DiNoto's PIP claim at $100,000, the Policy limits. USAA compelled DiNoto to hire counsel and file this lawsuit to obtain the Policy benefits he is owed.

4.106  USAA did not reimburse medical bills that USAA acknowledged were due. For example, USAA was required by the Policy to pay "**reasonable fees for medical necessary and appropriate service**." (USAA-DiNoto-000021). It is indisputable that DiNoto's 10-day hospitalization at Memorial Hermann and the medical care and treatment he received was medically necessary and appropriate as a result of the Accident, a covered cause of loss under the Policy. The PIP provisions of the TEXAS INSURANCE CODE required these bills to be paid within 30-days of being submitted, without regard to collateral sources. DiNoto's counsel provided these bills in October 2011, *and now, three years later, they still have not been paid*.

4.107  Additionally, USAA failed to comply with the Policy's terms regarding its handling of the Memorial Hermann bill. On January 27, 2012 USAA negotiated with Memorial Hermann to accept $47,548.41 as full payment of DiNoto's hospital bill. According to the Policy, this negotiated charge represents a "reasonable fee," and USAA was required to pay this amount to its insured within 5 business days.  (USAA-DiNoto-000021); (USAA-DiNoto-000044). But USAA refused to pay these bills, and justified its nonpayment by considering collateral sources like GEICO, BCBS, or Medicare. As outlined *supra*, pp. 6, ¶4.18, the TEXAS INSURANCE CODE expressly prohibits USAA from considering collateral sources when adjusting PIP claims. The consideration itself constitutes a violation of the PIP statute. TEX. INS. CODE §1952.155.

_____

4.108  USAA ignored DiNoto's requests, and its own statements to Medicare, and paid Medicare $12,405.13. This deprived DiNoto's counsel of the ability to negotiate a reduction on his behalf. Even more troubling, after making a payment under the MEDICARE SECONDARY PAYER ACT to Medicare, USAA treated Medicare as the primary insurance carrier, and repeatedly misrepresented the law, directing its insured and his providers to bill Medicare. Moreover, USAA refused to pay PIP on the premise that Medicare was primary.

4.109  USAA routinely misrepresents the law to its insureds to deny claims. These form letters—shifting losses to Medicare or any other insurer—allow USAA to avoid paying millions of dollars in claims each year. In making these misrepresentations USAA violates the Texas Insurance Code by:

i.   **making an untrue statement of material fact**;

ii.   failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made;

iii.   making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact; or,

iv.   **making a material misstatement of law**.

TEX. INS. CODE ANN. §541.061 (Vernon).

4.110  USAA and AIS have been doing this for years—to DiNoto and others—in a variety of ways, to deny or delay properly submitted PIP claims that should be paid.

4.111  DiNoto demonstrated his medical expenses to Defendants during the claim submission process. DiNoto submitted the Memorial Hermann billing records on October 17, 2011. He submitted additional medical and billing records, including Memorial

Hermann Hospital's medical records, on January 12, 2012, and sent a comprehensive set of records and bills on December 20, 2012.

4.112  Despite having these records, USAA (by its adjusters identified specifically above) sent dozens of "information requests" seeking information they already had. By doing so, USAA was able to delay payment while creating a facade of working diligently on the claim, and induced DiNoto to hold off in filing a suit, itself a violation of Tex. Ins. Code §541.162(b).

4.113  The information sought that USAA may not have had, primarily the providers' federal tax ID numbers, is wholly irrelevant to a determination of DiNoto's PIP claim. Nothing in the Policy or the PIP statute permits USAA to deny PIP claims for lack of a provider's tax ID, and tax IDs have no bearing on whether DiNoto's medical treatment is related to the Accident, or if the billed amount is reasonable. To be clear, the PIP policy requires payment to DiNoto and not the medical provider, absent an assignment. (USAA-DiNoto-000021 to 000023). USAA knows this, as reflected in its correspondence to Medicare. USAA's incessant requests for federal tax ID numbers were for the sole purpose of delay, and done in bad faith.

4.114  The repeated reimbursement denials left DiNoto without the PIP benefits he contracted and paid for as reflected in the Policy.

4.115  In addition to DiNoto's medical expenses, USAA completely denied DiNoto's lost income claim, itself a part of his PIP claim. In addition to the reimbursement of medical expenses, the PIP statute specifically identifies other economic losses that PIP is designed to protect against:

**(B)** **in the case of an income producer, replacement of income lost as the result of the accident;**

TEX. INS. CODE ANN. § 1952.151(3)(Vernon).

4.116  In accordance with the Policy, DiNoto provided USAA with substantial evidence concerning his loss of income and its relation to his injury. On December 20, 2012, DiNoto provided a letter from Craig Flower, a potential employer, "concerning [DiNoto's] previous and ongoing provision of consulting services, which upon your auto accident you were not able to continue and or begin the new assignment. The offered rate of $85.00 per hour is being receded. [sic] I regret that the 400+ hour assignment and expenses will not be available to you due to your accident." (USAA-DiNoto-000458). Mr. Flower's letter amounts to evidence of $34,000.00 in lost income directly related to the underlying car wreck.

4.117  In addition to the Flower letter, DiNoto also provided evidence of additional lost income—another consulting assignment, that time for $325 per hour. That job was expected to require 300 to 350 hours of work for a total income loss of between $97,500.00-$113,750.00. (USAA-DiNoto-000459 to 000460).

4.118  USAA, with the help of AIS, has been illegally denying PIP benefits for years. Obviously USAA's prior class action settlements were not sufficiently punitive to stop USAA and AIS from wrongfully denying, delaying, or underpaying PIP claims.

### H.   *Auto Injury Solutions*

4.119  Numerous letters from the USAA adjusters indicate that DiNoto should send "all correspondence and mail to" Auto Injury Solutions. (*see e.g.* USAA-DiNoto-

000378) Upon information and belief, AIS is USAA's contracted claims administrator. The relationship is so close that DiNoto cannot even tell whether the folks identified in correspondence as USAA adjusters, were actually AIS employees. For example, Patricia Baratin's signature routinely appears above an address block that identified "United Services Automobile Association," but then has the address of AIS. This can be most clearly seen in USAA-DiNoto-000402.

4.120  Because of the lack of discovery to clarify the employment and agency relationships of the various adjusters outlined above, DiNoto pleads that the acts committed by the various "USAA adjusters" and claims representatives were done jointly or severally by AIS, and that such persons were employees or agents of AIS, either jointly or severally with USAA.

4.121  Upon information and belief, USAA requires policyholders to submit medical records to AIS so that AIS may *create a basis for denial*. That is, if AIS can second guess the provider or make any argument that the policyholder's treatment was unnecessary or not the result of the accident, AIS and USAA will deny the claim. Ms. Baratin, upon information and belief was the primary adjuster for AIS/USAA assigned to DiNoto's PIP claim prior to Mr. Garcia's assignment. Rather than timely investigating and paying DiNoto's PIP claim, AIS used that time to create a pretext for denial. In this case, rather than using a bought and paid for engineering company to rubber stamp denials of claims (*Arnold, Giles, Nicolau*), USAA bought and paid for "medical and automobile insurance claims professionals" who provided "end-to-end medical review solutions"—designed to save USAA money by illegally denying PIP claims.

4.122  AIS is an agent or contractual adjuster for USAA.  AIS is a "person" as that term is defined by Section 541.002(2) of the TEXAS INSURANCE CODE.

4.123  USAA and AIS worked together to frustrate DiNoto's PIP claim by constantly asking for more, well after DiNoto demonstrated "reasonable medical proof" of his injury.

### I.      Facts Relevant to the Class

4.124  USAA and AIS have engaged in a pattern and practice, to routinely deny and underpay USAA insureds' legitimate PIP claims. By delaying, denying, or conditioning PIP payments, Defendants have created a systematic means to violate statutory and common law duties, and have significantly damaged Plaintiffs, as described more fully below.

4.125  Upon information and belief, USAA and AIS's treatment of DiNoto's PIP claim is not unique to DiNoto, or the result of a few rouge employees. In fact, DiNoto is personally aware of numerous other policyholders to whom USAA has delayed, denied, or conditioned PIP benefits. Upon information and belief, there are numerous attorneys across the State of Texas who will testify that USAA routinely delay, denies, conditions, or underpays PIP claims for policyholders they represent.

4.126  Furthermore, USAA and AIS's formulaic justifications for denial—(1) Medicare or other private insurance is primary, (2) an alleged lack of information, (3) need for a provider's tax IDs, (4) ICD-9 codes, (4) or references to inapplicable case law concerning the reasonableness and necessity of medical bills paid by the at-fault party—

demonstrate a coordinated scheme. One can easily imagine an unrepresented insured simply giving up.

    4.127  Nor is this the first allegation against USAA. In the past 5 years USAA and AIS have been the subject of almost half a dozen class action complaints concerning conduct similar to that complained of by DiNoto—namely the denial and/or underpayment of personal injury protection benefits. Thus far, DiNoto has uncovered class actions involving the denial, delay, or underpayment of PIP claims in Florida,[2] Oregon,[3] Arizona,[4] Washington,[5] and Illinois.[6] To date, USAA has settled all of these class action complaints for millions of dollars. Many of these complaints describe claims identical to DiNoto's.[7] For example, in *Soukup v. USAA Casualty Ins. Co.*, USAA's conduct is described:

> USAA contracted with an apparent third-party provider, Auto Injury Solutions, Inc., to assist USAA in implementing and carrying out its fraudulent cost containment program under the guise of AIS providing 'independent' and impartial medical review services. In reality, AIS serves at the direction of USAA, and/or as the alter ego

---

[2] *MRI Associates of St. Pete, Inc., d/b/a Saint Pete MRI, et al. v. USAA*; Cause No. 10-CA-016785; 13th Judicial Cir. Ct., Hillsborough Co., FL.

[3] Exhibit "2," *Soukup v. USAA Casualty Ins. Co., et al.*, Cause No. 3:11-CV-565; *see* Exhibit "3," *USAA Sued Over Claims*, San Antonio Express News, May 12, 2011.

[4] *Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360, 362 (D. Ariz. 2009).

[5] *Cote v. United Services Automobile Association, et al.*, Cause No. 12-2-12637-2 KNT; Superior Ct. King County, Washington.

[6] *Bemis v. United Services Automobile Association, et al.*; Madison Co. Cir. Ct. 2005.

[7] Exhibit "4," *Notice of Class Settlement in MRI Associates*, pp. 3 ("2. What is this lawsuit about? The lawsuit is about whether USAA improperly failed to make full payment of personal injury protection [] benefits in an amount allowable under chapter 627 of the Florida Statutes.").

> of USAA, in that AIS's services are not rendered independently and
> are focused on generating false and misleading reports in order to
> save USAA millions of dollars at the expense of military personnel
> and their family members who have been injured in automobile
> collisions and whose bills were reasonable and necessarily incurred.

*See* Ex. "2," pp. 13.

## V.  CLASS ACTION ALLEGATIONS

5.1    This action is brought as a class action under the TEXAS INSURANCE CODE

§541.251.  Upon information and belief, USAA and AIS's conduct of denying, delaying,

or conditioning PIP payments has been systematic and continuous and has affected

similarly situated Plaintiffs over time.  DiNoto brings this class action to secure redress

for USAA and AIS's denial of properly submitted insurance claims, and for Texas state

statutory and other common law causes of action.  USAA and AIS's obligations and

conduct have been uniform throughout the Class Period and there are common questions

of law and fact that affect the entire Class.

5.2    DiNoto brings this action individually and on behalf of all persons similarly

situated and seeks certification of the following Class:

> All persons who were issued USAA automobile insurance policies in the State of
> Texas which USAA wrongfully delayed, denied, or conditioned PIP claim
> payments as part of a Texas wide scheme, and who:
>
> (a)    are currently insured by USAA, or at the time a PIP claim
>         was made, were insured by USAA with insurance coverage
>         that included PIP coverage (collectively the "Coverage");
>         and,
>
> (b)    had their PIP benefits improperly delayed, denied, or
>         conditioned; and,

Excluded from this class are:

    (a)    those who have not been denied their benefits coverage by USAA as described above;

    (b)    Plaintiffs' counsel; and

    (c)    the Judge of the Court to which this case is assigned.

5.3    Membership in the Class is so numerous as to make it impractical to bring all Class members before the Court. TEX. INS. CODE §541.256(1).  The exact number of Class members is unknown, but can be determined from the records maintained by USAA.  DiNoto believes there are thousands of persons in the Class.

5.4    The named Plaintiff is a member of the Class of victims described herein.

5.5    There are numerous and substantial questions of law and fact common to all of the members of the Class which will control this litigation and which will predominate over any individual issues.  See TEX. INS. CODE §541.256(2).  Included within the common questions of law and fact are:

    (a)    whether USAA and AIS's denials, delays, or conditions regarding payment of Coverage is unlawful;

    (b)    whether USAA and AIS's denial, delay, or conditions concerning PIP payments harms policyholders;

    (c)    whether USAA violated its common law duties of good faith and fair dealing;

    (d)    whether USAA breached its contract with each Class member by failing to timely pay properly submitted PIP claims;

    (e)    whether USAA breached its contract with each Class member by denying PIP claims unless and until the Class member provided evidence of their injuries;

(f)     whether USAA violated sections §1952.151, *et seq.* of the TEXAS INSURANCE CODE pertaining to PIP.

(g)     whether USAA and AIS violated sections 541 and USAA violated 542 of the TEXAS INSURANCE CODE;

(h)     whether USAA was unjustly and substantially enriched as a result of this wrongful conduct;

(i)     whether the acts and conduct of USAA violated other state and/or common laws; and,

(j)     whether Class members were damaged as a result of this conduct.

5.6     The claims of DiNoto are typical of the claims of the Class and DiNoto has no interests adverse to the interests of other members of the Class.  See TEX. INS. CODE §541.256(3).  To the extent that the Class must be divided into subclasses, that option is available given the uniformity of the questions of law and fact common to any subclasses. TEX. INS. CODE §541.258.

5.7     DiNoto will fairly and adequately protect the interests of the Class and has retained counsel experienced and competent in the prosecution of class actions, complex litigation, and specifically insurance class action claims.

5.8     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, the Class members will continue to suffer damages and USAA and AIS's conduct will proceed without effective remedy.

5.9     Most individual members of the Class have little interest in or ability to prosecute an individual action, due to the complexity of the issues involved in this

litigation and the relatively small, although significant, damages suffered by each member of the Class.

5.10    This action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured.

5.11    This action should present no difficulty that would impede its management by the Court as a class action and is the best available means by which DiNoto and the members of the Class can seek redress for the harm caused to them by Defendants.

## VI. DINOTO AND CLASS CLAIMS
## BREACH OF CONTRACT- CLAIM AGAINST USAA

6.1    The insurance policy USAA issued to Plaintiffs is a valid and enforceable contract that requires USAA to pay benefits according to the terms of that policy.  By failing to pay the PIP benefits described above, USAA breached the contract and as a result, Plaintiffs have incurred damages and unnecessary hardship.  DiNoto, and other similarly situated Plaintiffs included in the class have complied with all conditions precedent to bringing this action, including promptly submitting his proof of loss and giving written notice to USAA of this claim.

6.2    DiNoto and other similarly situated Plaintiffs included in the class are proper Plaintiffs to bring this action because they are parties to the insurance contracts breached by USAA.  (*See e.g.* USAA-DiNoto-000005).

6.3     DiNoto and other similarly situated Plaintiffs included in the class performed under the contract by paying premiums and complying with the contracts' terms and conditions.

6.4     USAA breached these contracts by failing to comply with its promise to pay benefits owed under the insurance contract. For example, on January 27, 2012 USAA negotiated with Memorial Hermann to accept $47,548.41 as payment in full of Mr. DiNoto's hospital bill.   Under the language of USAA's policy, this charge negotiated with the provider represents the "reasonable fee" USAA was required to pay its insured this amount within 5 business days.  (USAA-DiNoto-000021); (USAA-DiNoto-000044). USAA refused to do so and thereby breached the contract.  The breach is material as the payment of benefits is essence of a contract for insurance.

6.5     USAA's breach injured DiNoto and the other similarly situated Plaintiffs included in the class by denying them financial resources to pay medical bills and replace lost wages. Had USAA complied with the terms of the contract, DiNoto and the other similarly situated Plaintiffs included in the class would have received the money they contracted for and been better off.

### TEXAS INSURANCE CODE PIP PROVISION VIOLATIONS – CLAIM AGAINST USAA

6.6     USAA has violated TEX. INS. CODE §1952.151, *et seq.* by its refusal to pay PIP benefits in a timely manner.  Specifically, USAA violated §1952.155 by refusing to pay benefits without regard to fault or "any collateral source of medical, hospital, or wage continuation benefits."

6.7    In DiNoto's individual case, USAA routinely considered collateral sources of benefits such as DiNoto's BCBS. Christy Gawlik interviewed DiNoto to determine if he had health insurance and Medicare on June 29, 2011. (USAA-Dinoto-00112). She then acknowledged that USAA would consider these benefits by setting "expectations for the loss" and describing how Medicare would affect how quickly USAA paid. *Id.* On August 10, Ms. Gawlik again improperly considered collateral sources, this time the 3rd party liability carrier, instructing DiNoto to send the hospital bill to GEICO. (USAA-DiNoto-000105). Ms. Baratin, the adjuster next assigned to the case, was specifically instructed to ask DiNoto if his medical bills were being submitted to health insurance or Medicare. (USAA-DiNoto-000101). USAA again considered the collateral sources on November 15, 2011, when USAA's manager instructs Ms. Baratin to check with BCBS and ask what they paid out. (USAA-DiNoto-000097). Most clearly, on December 9, 2011, Ms. Baratin noted that USAA was **closing** DiNoto's PIP claim because the bills were being paid by BCBS and that the claim would be reopened if USAA received a subrogation demand. (USAA-DiNoto-000096). Later, after Ms. Baratin reviewed and prepared a payment of $47,548.41 to DiNoto for his hospital bill, USAA's manager vetoed the payment because of BCBS's involvement. (USAA-DiNoto-000094 to 000095). Ms. Baratin admitted to considering collateral sources in a phone call to Plaintiff's counsel on February 24, 2012, even after being advised that consideration of collateral sources directly violates the statute. (USAA-DiNoto-000093 to 000094).

6.8    Ms. Baratin then sent a letter discussing *Haygood v. de Escobedo* the same day. (USAA-DiNoto-000428). *Haygood* deals with the submission of evidence of

medical expenses paid by health insurance or government programs in at-fault tortfeasor context, and in the court's own words "the collateral source rule continues to apply to such expenses..." *Haygood v. de Escobedo*, 356 S.W.3d 390, 391 (Tex. 2011). To invoke *Haygood*, a case interpreting chapter 41 of the TEXAS CIVIL PRACTICE & REMEDIES CODE, is to admit considering the effects of collateral sources. The case is wholly inapplicable to the payment of PIP.

6.9   USAA's insistence that DiNoto send his bill to Medicare for primary payment is also improper consideration of collateral sources. Rather than complying with the PIP statute and paying without regard to whether there is a collateral source available, USAA delays in the hopes of paying less. Examples of USAA's directing DiNoto to submit bills to Medicare and misrepresenting Medicare as the primary carrier are described in detail in Section 4, Subsection E, *supra* and appear at: USAA-DiNoto-006607 to 006612; 005821 to 005822; 006570 to 006576; 005723 to 005724; 005576 to 005577; 005781 to 005782; 005663 to 005664; 005636 to 005637; 005808 to 005809; 006604 to 006605; and 005538 to 005544.

6.10   USAA's insistence on ICD-9 codes, CPT codes, physical addresses, federal tax ID numbers of providers, and other data is designed to delay and deny payments, and violates the requirements of the TEXAS INSURANCE CODE. The TEXAS INSURANCE CODE § 1952.155(a) requires that PIP benefits be paid within 30-days of satisfactory proof of the claim. TEX. INS. CODE § 1952.155(b) notes that an insurer *may require* reasonable medical proof of an alleged recurrence if there is a lapse in treatment;

however, no such requirement exists when providing benefits for an initial occurrence so obviously associated with a covered claim.

6.11    In this case, USAA knew that DiNoto was injured in the Accident when his daughter informed it of that fact. (USAA-DiNoto-00123). The Texas Peace Officer's Crash Report identifying DiNoto as having sustained incapacitating injuries and being transported by EMS to Memorial Hermann was received by USAA within weeks of the crash. (USAA-DiNoto-000140). On October 17, 2011, USAA had the Memorial Hermann billing records. (USAA-DiNoto-005227 to 005237). The Memorial Hermann billing record contained medical codes (with the translations) that clearly related the treatment and diagnoses to a motor vehicle crash. *Id.* The billing record included the names and codes of treatment clearly appropriate for the type of injuries USAA knew DiNoto sustained after speaking with his family members. The records contain diagnostic testing (including head and spine CTs), room charges, powerful pain medication, cervical collars, bandages, physical therapy, and emergency room charges. *Id.* The records also show that DiNoto's admission was an emergency, via the Emergency Department, and that the service was "trauma," and identified the names of the attending physicians. *Id.*

6.12    USAA never *internally* questioned whether DiNoto was actually involved in the Accident, or the severity of his injuries. Even before it got the police report, USAA gave authority to its adjusters to pay DiNoto's PIP policy limits of $100,000. (USAA-DiNoto-000116 to 000117).  USAA simply refused to pay.

6.13    Other reimbursements were denied because of an alleged lack of information, yet USAA actually had nearly all of the information it was requesting; and

certainly had all of the relevant information to determine if the medical care was reasonable and necessarily related to the Accident.

6.14    For example, USAA sought CPT codes for physicians whose treatment was given in the hospital and described in detail in the hospital bills and records. (*See supra*, ¶¶ 4.71, 4.72, 4.80, and 4.81). USAA sought ICD-9 diagnosis codes, providers names, tax ID numbers, and physical location from the radiologists who did follow up studies after Mr. DiNoto got out of the hospital, despite the fact that the provider's names, address, the procedures done, and the impressions were clear from the records. (*See supra*, ¶¶ 4.77 and 4.78).  USAA sent a request for similar information to Brian Johnston, even though it had that information for over a year. (*See supra*, ¶ 4.79). The same with Dr. Pollock. (*See supra*, ¶¶ 4.82 and 4.83). Of special note are the records of Dr. Chementi and Dr. Livingston.  USAA had both of their records that contained all of the information USAA was requesting, except the provider's tax ID, when USAA sent the request. (*See supra* ¶¶ 4.84, 4.85, 4.88, and 4.89). Likewise, USAA had Mischner Neuroscience's records, with all the information it claimed it needed (except federal tax ID number) before it sent requests for more information. (*See supra*, ¶¶ 4.86 and 4.87).

6.15    In any event, by January 7, 2013, USAA had received its commissioned nursing review that clearly showed DiNoto's hospital treatment and the treatment from Dr. Livingston related to the Accident. (USAA-DoNoto-001393 to 001408).

6.16    As to DiNoto's lost wages, USAA simply refused to consider it and gave no credible explanation for its refusal.

6.17    Upon information and belief, these same tactics and schemes to delay and deny PIP coverage are employed by USAA against all its policyholders in the State of Texas. Upon information and belief, discovery will reveal similar malfeasance on the part of USAA with regard to the other similarly situated Plaintiffs included in the class. Counsel for Plaintiffs in this case are aware of many other USAA PIP policyholders who have been victimized by USAA's polices. Upon information and belief, there are numerous attorneys representing policyholders against USAA who are aware of multiple instances of conduct such as that described herein.

## TEXAS DECEPTIVE TRADE ACT PRACTICE VIOLATIONS – CLAIM AGAINST USAA AND AIS

6.18    Plaintiffs are "consumer[s]" as defined by TEX. BUS. CODE §17.45(4). Plaintiffs sought or acquired goods or services by purchasing those goods or services from USAA. USAA violated the TEXAS DECEPTIVE TRADE PRACTICES ACT ("DTPA") (TEX. BUS. & COM. CODE §17.44 *et seq*.) because USAA engaged in false, misleading, and/or deceptive acts or practices that Plaintiffs relied on to their detriment.

6.19    Specifically, Plaintiffs purchased insurance services from USAA.

6.20    USAA violated § 17.46(b) by engaging in "false, misleading, or deceptive acts".  All of the acts described below occurred in Texas.

6.21    USAA violated § 17.46(b)(5) by representing that its insurance contracts had characteristics, uses, benefits which they did not have. Specifically, USAA represented to DiNoto and the other similarly situated Plaintiffs included in the class, prior to issuing the insurance policy and through its term, that its insurance contracts

included PIP benefits as those benefits are described in law. (USAA-DiNoto-000005, 000020 to 000023). USAA represented that it would pay PIP for a covered person involved in an auto accident, including reasonable fees for medically necessary and appropriate services and 80% of a wage earner's income actually lost. ((USAA-DiNoto 000021 & USAA-DiNoto-000040). USAA promised these benefits within 30-days of proof of the claim. (USAA-DiNoto-000023). USAA made these promises in an effort to secure insurance contracts and premiums, and breached these promises in order to avoid contract payments so that USAA could enjoy the profit on unpaid benefits. In fact, USAA's insurance as administered does not provide these benefits, and certainly does not provide them within 30-days, as promised. The facts underlying this claim are described in Section 4, *supra*.

6.22   USAA violated § 17.46(b)(9) by advertising a good or service with the intent not to sell them as advertised. USAA advertised to DiNoto and other similarly situated Plaintiffs, prior to issuing the insurance policy and through its term, that it would provide automobile insurance as required by law, and that it would fulfill its contractual obligations, as identified in paragraph 6.17, when they are triggered. In fact, USAA intended to delay and deny claims and avoid payment of its obligations. USAA intended to avoid payment within the 30-day window, and intended to foist its obligations onto any other party, rather than comply with the terms of its policies. The facts underlying this claim are described in Section 4, *supra*.

6.23   USAA violated § 17.46(b)(24) by failing to disclose to DiNoto and the other similarly situated Plaintiffs, USAA's scheme to deny and underpay legitimate PIP

claims. USAA failed to disclose this information in an effort to induce the Plaintiffs to purchase insurance with USAA and maintain insurance with USAA after it was purchased. If USAA had disclosed that it would not honor Texas law or the terms of its contract with the Plaintiffs, they would not have purchased the insurance products offered by USAA. This failure to disclose occurred prior to USAA's issuing the insurance policy and throughout its term. In fact, USAA intended to delay and deny claims and avoid payment of its obligations. USAA intended to avoid payment within the 30-days it stated it will pay, and intended to foist its obligations onto any other party rather than comply with the terms of its policies. The facts underlying this claim are described in Section 4, *supra*.

6.24    DiNoto and other similarly situated Plaintiffs included in the class relied on these false statements, false advertising, and failures to disclose in purchasing insurance with USAA and paying on-going premiums.

6.25    DiNoto and other similarly situated Plaintiffs included in the class have suffered damages, namely the loss of the economic benefits promised by USAA, as well as unpaid medical bills and unmet financial needs from lack of replacement for lost income, as a direct result of the violation by USAA.

6.26    Moreover, the course of conduct undertaken by USAA in handling PIP claims for DiNoto and other similarly situated Plaintiffs included in the class, including misrepresenting to its insured that it would pay medical bills as they came in and would pay for lost income, misrepresenting that government programs or another insurer is the primary payer, failing to reimburse for covered medical expenses after knowing they

should be covered and thus increasing the cost and hardship on its insureds, requesting information that is irrelevant to the determining any material issues under the policy, requesting information already known to USAA, and collecting premiums for coverage which USAA intends to delay and deny, represents an unconscionable course of action in violation of the § 17.50(a)(3). The specifics of this course of conduct as it occurred with regard to DiNoto are contained in section 4, *supra*.

6.27   USAA further violated the DTPA due to its violations of TEXAS INSURANCE CODE § 541.151 *et seq*., the tie-in provisions, which are described in detail below.

6.28   AIS is an agent or contracting adjuster for USAA. Upon information and belief, the acts described in this Section (except collecting premiums for coverage which USAA intends to delay or deny) were perpetuated or participated in by AIS as an agent or contracting adjuster for USAA. AIS and USAA worked together in adjusting DiNoto's PIP claim, with USAA requesting information previously sent (as directed) to AIS. Moreover, it appears that Patricia Baratin may work for both AIS and USAA.

6.29   These Defendants' acts and omissions were a producing cause of Plaintiffs' damages.

6.30   These Defendants' conduct was committed knowingly and/or intentionally, because, at the time of the acts and practices complained of USAA and AIS had actual awareness of the falsity, deception or unfairness of their acts and practices giving rise to Plaintiffs' claims and Plaintiffs detrimentally relied on the falsity or deception and/or in detrimental ignorance of the unfairness.

## TEXAS INSURANCE CODE §541 ET. SEQ. VIOLATIONS – CLAIM AGAINST USAA AND AIS

6.31    Defendants violated the TEXAS INSURANCE CODE §541 *et. seq*. because they engaged in unfair and/or deceptive acts or practices in the business of insurance.

6.32    USAA violated §541.051(1) by making statements that misrepresented the terms of the insurance policy and the benefits or advantages promised by the policy. USAA represented to DiNoto and the other similarly situated Plaintiffs included in the class, prior to issuing the insurance policy and through its term, that its insurance contracts included PIP benefits as those benefits are described in law. (USAA-DiNoto-000005, 000020 to 000023). USAA represented that it would pay PIP coverages for a covered person involved in an auto accident, including reasonable fees for medically necessary and appropriate services and 80% of a wage earner's lost income. (USAA-DiNoto 000021 & USAA-DiNoto-000040). USAA promised these benefits within 30-days of proof of the claim. (USAA-DiNoto-000023). USAA made these promises in an effort to secure insurance contracts and premiums, and to avoid payment of contracted benefits so that USAA could enjoy the profit on unpaid benefits. In fact, USAA's insurance as actually administered does not provide these benefits, and certainly does not provide them within 30-days as promised. The facts underlying this claim are described in Section 4, *supra*.

6.33    USAA further violated §541.051(1) each time its adjuster referred to Medicare or another insurer as the primary payer. USAA also violated § 541.051 each time it stated that it could not or would not pay benefits because of a BCBS lien,

Medicare lien, or other collateral source. Because the terms of the Policy and the law governing the Policy do not permit USAA to consider collateral sources, each statement directing its insured to a collateral source or stating that a collateral source had paid a bill and therefore USAA would not reimburse DiNoto, was a misrepresentation of the terms of the Policy and the law. Specific instances of these misrepresentations include Ms. Gawlik's "setting of expectations" on June 29, 2011 (USAA-DiNoto-000112), Ms. Gawlik's August 10, 2011 suggestion that DiNoto submit his hospital bill to GEICO (USAA-DiNoto 000105), USAA negotiating DiNoto's Memorial Hospital bill on January 27, 2012 and then refusing to pay the negotiated amount; Ms. Baratin's February 24, 2012 call to DiNoto's attorney stating that payment could not be made due to Medicare's payment (USAA-DiNoto-000093 to 000094), Ms. Baratin's February 24 *Escobedo* letter (USAA-DiNoto-000428), Ms. Baratin's February 29, 2012 EOR adjustment sent to DiNoto (USAA-DiNoto-0005238), and the numerous EORs and correspondence describing Medicare as "primary" (e.g. USAA-DiNoto-006607 to 006612; 005821 to 005822; 006570 to 006576; 005723 to 005724; 005576 to 005577; 005781 to 005782; 005663 to 005664; 005636 to 005637; 005808 to 005809; 006604 to 006605; and 005538 to 005544).

6.34   USAA further violated §541.051(1) each time its adjuster sought information that was unneeded under the Policy or that USAA already had. Because the terms of the Policy and the law governing the Policy do not require USAA to have ICD-9 codes, CPT codes, federal tax ID numbers, or other myriad data that is not related to the medical necessity and reasonableness of the charge, each request for such data

misrepresents that the Policy does make such requirement. Specific instances of these misrepresentations are described in Paragraphs 4.71 through 4.91 and the paragraphs cited therein.

6.35   USAA violated §541.060(1) by misrepresenting to Plaintiffs material facts or policy provisions. USAA misrepresented to its insured that USAA would pay medical bills as they were provided to USAA. For example, on August 10 by Ms. Gawlik (*see e.g.* USAA-DiNoto-000391). And USAA maintained that it would pay reasonable fees for medically necessary and appropriate services, (USAA-DiNoto 000021) and 80% of a wage earner's lost income. (USAA-DiNoto-000040). USAA promised these benefits within 30-days of proof of the claim. (USAA-DiNoto-000023). USAA made these representations to DiNoto and the other similarly situated Plaintiffs included in the class, prior to issuing the insurance policy and through its term, and during the claim process. These representations were knowingly false, as USAA did not intend to pay the benefits within 30-days, and intended to pay much less than reasonable medical fees and 80% of lost earnings.  The facts underlying this claim are described in Section 4, *supra*.

6.36   USAA further violated §541.060(1) each time its adjuster referred to Medicare or another insurer as the primary payer. USAA also violated § 541.060 each time it stated that it could not or world not pay benefits because of a BCBS lien, Medicare lien, or other collateral source. Because the terms of the Policy and the law governing the Policy do not permit USAA to consider collateral sources, these statements are misstatements of material fact or misstatements concerning a Policy provision. Specific examples are given in Paragraphs 4.92 through 4.102, *supra*.

6.37   USAA further violated §541.060(1) each time its adjuster sought information that was unneeded under the Policy, or that USAA already had. Because the terms of the Policy and the law governing the Policy do not require USAA to have ICD-9 codes, CPT codes, federal tax ID numbers, or other myriad data that is unrelated to the medical necessity and reasonableness of the charge, each request for such data misrepresents that the Policy does make such requirements. Specific instances of these misrepresentations are described in Paragraphs 4.71 through 4.91 and the paragraphs cited therein.

6.38   USAA further violated §541.060(1) when its adjuster informed Medicare, with a carbon copy to DiNoto's attorney, that USAA would pay DiNoto the referenced benefit amounts, and that Medicare must contact DiNoto to secure its interest. (USAA-DiNoto-000404). In fact, USAA paid Medicare directly, despite its insured's instructions to the contrary. USAA's payment to Medicare harmed DiNoto because it deprived his attorney of the ability to negotiate a reduction of the lien on his behalf.

6.39   USAA further violated §541.060(1) when its adjusters failed to inform DiNoto or his counsel that his PIP claim was being closed because of the availability of collateral sources. (USAA-DiNoto-000096). By failing to inform DiNoto of USAA's position, USAA misrepresented its willingness to pay benefits under the Policy with the intent of lulling DiNoto into complacency and avoiding suit against USAA.

6.40   USAA further violated §541.060(1) when Patricia Baratin sent an EOR on October 27, 2011 stating that no reimbursement decision concerning Memorial Hermann bill could be made because documentation was needed to substantiate the relatedness of

treatment. (USAA-DiNoto-006538 to 006541). In fact, USAA had the information it needed, and knew the treatment was related to emergency medical care. Upon information and belief, USAA intentionally delayed treatment so that Medicare or another insurer would pay.

6.41    USAA further violated §541.060(2) by failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of PIP claims once the insurer's liability has become reasonably clear.  The facts underlying this claim are described in Section 4, *supra*.

6.42    USAA violated §541.060(2) when Patricia Baratin sent an EOR on October 27, 2011 stating that no reimbursement decision concerning Memorial Hermann Hospital's bill could be made because documentation was needed to substantiate the relatedness of treatment. (USAA-DiNoto-006538 to 006541). In fact, USAA had the information it needed, and knew the treatment was related to emergency medical care. Upon information and belief, USAA intentionally delayed treatment so that Medicare or another insurer would pay. USAA also violated §541.060(2) on January 27, 2012 when it negotiated DiNoto's Memorial Hospital bill, allocated $47,548.41 in PIP benefits to DiNoto, and then refused to pay the amount within 5 business days.

6.43    USAA violated §541.060(2) each time its adjuster referred DiNoto to Medicare or another insurer as the primary payer. USAA also violated § 541.060(2) each time it stated that it could not or would not pay benefits because of a BCBS, Medicare lien, or other collateral source. Because the terms of the Policy and the law governing the Policy do not permit USAA to consider collateral sources, these statements represent a

lack of good faith effort to settle a reasonably clear claim. Although DiNoto's traumatic injuries caused by the Accident were well documented in the records USAA had, USAA relied instead on extracontractual and illegal considerations of collateral sources to delay and deny payment of reasonably clear claims. Specific examples are given in Paragraphs 4.92 through 4.102, *supra*.

6.44    USAA further violated §541.060(2) each time its adjuster sought information that was unneeded under the Policy, or that USAA already had. Because the terms of the Policy and the law governing the Policy do not require USAA to have ICD-9 codes, CPT codes, federal tax ID numbers, or other myriad data that is unrelated to the medical necessity and reasonableness of the charge, each request for such data is nothing more than a bad faith attempt to delay and deny settlement of claims that were reasonably clear under the PIP provision of the Policy and PIP statute. Specific instances of these bad faith requests are described in Paragraphs 4.71 through 4.91, *supra*.

6.45    USAA further violated §541.060(2) by refusing to consider and make a good faith effort to make a prompt, fair, and equitable settlement of DiNoto's lost wage claim. The Policy's PIP provision requires only a showing that DiNoto was an "income producer" and in an "occupational status" (USAA-DiNoto-000040). DiNoto's status as an income producer and being in occupational status were established with letters rescinding specific employment due to the injury, and referencing DiNoto's injury—and nothing else—as the basis for rescission. (USAA-DiNoto-00458 to 000460). Moreover, DiNoto produced federal income tax returns for the four years prior to the Accident. (USAA-DiNoto-001629, 001645 to 001656). Despite this evidence, and without any

explanation, USAA simply refused to pay lost income benefits under the PIP provision of the Policy.

6.46    USAA violated §541.060(3) by failing to promptly provide DiNoto with a reasonable explanation of the basis in the Policy for the insurer's denial of his claim. The reasons given for denial of his claim varied from lack of information, referral to another insurer or government program, to lack of documentation relating the treatment to the Accident. None of the reasons given by USAA meet the requirements of § 541.060(3) because they do not refer to actually true facts, or the reasons relate to unknown defenses that are not found within the Policy, or are actually illegal under Texas law.

6.47    USAA violated §541.060(4) by refusing to affirm or deny coverage of DiNoto's lost income claim. To date, USAA has not stated that it will pay some, all, or none of DiNoto's lost wages, and has not given a reason for its unknown decision.

6.48    USAA violated §541.060(7) by refusing to pay DiNoto's PIP claims without conducting a reasonable investigation. In fact, as detailed in the preceding paragraphs, USAA's investigation was pre-textual and unreasonable. For example, USAA did not conduct a reasonable investigation when it failed to consider the information it already had in making a reimbursement decision about DiNoto's hospital bills on October 27, 2011. (*See* ¶ 4.54). Nor did USAA conduct a reasonable investigation of whether it, or Medicare, should be the primary payer before refusing to provide reimbursement on those grounds. (*See* ¶¶ 4.92 through 4.102, and those cited therein). Based on USAA's pleadings, it is clear that this multibillion-dollar insurer is aware that PIP is primary and Medicare is secondary. Also, Medicare *told* USAA that

Medicare was secondary and USAA was primary on January 6, 2012 (USAA-DiNoto-000411) before USAA started denying payments on the grounds that Medicare was primary. Nor did USAA conduct a reasonable investigation before denying a PIP payment because a box on a billing form was not checked off, without first looking at the attached record that clearly related the treatment to the Accident. (*See* ¶ 4.76).

6.49   USAA violated §541.061(1) of the Texas Insurance Code by misrepresenting the Policy and making untrue statements of fact. USAA made untrue statements of facts each time its adjuster referred to Medicare or another insurer as the primary payer. USAA knew this was false because Medicare told them so. (USAA-DiNoto-000411) and because the PIP statute is clear that an insurer cannot consider collateral sources. And because USAA is a huge insurance company with lawyers that, we can fairly presume, advise USAA what the law *is*. Because the terms of the Policy and the law governing the Policy do not permit USAA to consider collateral sources, each statement directing its insured to a collateral source, or stating that a collateral source had paid a bill, therefore USAA would not pay, was a false statement of fact about the terms of the Policy. Specific instances of these misrepresentations are described in ¶¶ 4.92 through 4.102.

6.50   USAA further violated §541.061(1) each time its adjuster sought information that was unneeded under the policy or that USAA already had. Because the terms of the Policy and the law governing the Policy do not require USAA to have ICD-9 codes, CPT codes, federal tax ID numbers, or other myriad data that is unrelated to the medical necessity and reasonableness of the charge, each request for such data is a false

statement of fact that that the policy does so require. Moreover, requesting information that USAA already had by saying the USAA did not have it and needed it is a false statement of fact. Specific instances of these false statements are described in Paragraphs 4.71 through 4.91 and the paragraphs cited therein.

6.51    USAA violated §541.061(1) by making false statements of fact to DiNoto. USAA misrepresented to its insured that USAA would pay medical bills as they were provided to USAA. Specifically, on August 10 Ms. Gawlik made such a misrepresentation to DiNoto (see e.g. USAA-DiNoto-000391). And USAA maintained that it would pay reasonable fees for medically necessary and appropriate services, (USAA-DiNoto 000021) and 80% of a wage earner's lost income. (USAA-DiNoto-000040). USAA promised these benefits within 30-days of proof of the claim. (USAA-DiNoto-000023). USAA made these representations to DiNoto and the other similarly situated Plaintiffs included in the class, prior to issuing USAA insurance policies and through its term, and during the claim process.  These representations were knowingly false, as USAA did not intend to pay the benefits within 30-days, and intended to pay much less than reasonable medical fees and 80% of lost earnings.

6.52    In the alternative to ¶¶ 6.35 through 6.51, DiNoto alleges that the conduct described in those paragraphs violates §541.061(2) by failing to state material facts necessary to make the other statements not misleading, or by making statements in a manner that would mislead a reasonably prudent person to a false conclusion of material fact.

6.53   USAA violated §541.061(4) of the TEXAS INSURANCE CODE by misrepresenting its insurance policies by making material misstatements of law. USAA misstated the law each time its adjuster referred to Medicare or another insurer as the primary payer. USAA knew this was false because Medicare told them so. (USAA-DiNoto-000411) and because the PIP statute is clear that an insurer cannot consider collateral sources. Because the terms of the Policy and the law governing the Policy do not permit USAA to consider collateral sources, each statement directing its insured to a collateral source or stating that a collateral source had paid a bill, and therefore USAA would not pay was a misstatement of law. Specific instances of these misrepresentations are described in Paragraphs 4.92 through 4.102.

6.54   AIS is an agent or contracting adjuster for USAA. Upon information and belief, the acts described in this section were perpetuated or participated in by AIS as an agent or contracting adjuster for USAA. AIS and USAA worked together in adjusting DiNoto's PIP claim, with USAA requesting information it already had or did not need to be sent to AIS. Moreover, it appears that Patricia Baratin and Jose Garcia may work for both AIS and USAA.

6.55   Defendants' conduct was committed knowingly because Defendants had actual awareness of the falsity, deception or unfairness of their acts and practices made the basis for DiNoto's claim for damages under the TEXAS INSURANCE CODE.

6.56   DiNoto gave USAA notice as required by §541.154 of the TEXAS INSURANCE CODE.

6.57   Defendants' conduct was producing cause of Plaintiffs' injuries.

## TEXAS INSURANCE CODE §542 ET. SEQ. VIOLATIONS – CLAIM AGAINST USAA

6.58   USAA violated Chapter 542 of the TEXAS INSURANCE CODE because it failed to do the following within the statutorily mandated time of receiving all necessary information:

> (a)   Failing to give proper notice of the acceptance or rejection of part or all of Plaintiffs' claims;
>
> …
>
> (c)   Failing to accept or deny Plaintiffs' full and entire claim within the statutorily mandated time of receiving all information;
>
> (d)   Failing to pay Plaintiffs' claim without delay; and,
>
> …
>
> (f)   Failing to include the requisite penalty interest on any and all payments made beyond the statutorily designated time to make payment in full for Plaintiffs' claim.

6.59   As described above, USAA has not given proper notice of the acceptance or rejection of part or all of DiNoto's claim. In addition to the facts described previously, there are unpaid medical expenses that were *not* paid by Medicare and which USAA has not stated whether it will pay or not.  For example, Mischner Neuroscience's bill shows unreimbursed out-of-pocket expenses paid by DiNoto and not a third party. (USAA-DiNoto-000773 to 000774). Dr. Pollock's records show a payment by the patient of

$3,000 that has not been reimbursed or denied by USAA. (USAA-DiNoto-000661). A billing records affidavit from UT Physicians shows that $958.00 is still outstanding and has never been accepted or rejected. (USAA-DiNoto-000484). Another shows that Texas ENT Specialists is still owed $269.00. (USAA-DiNoto-000550). DiNoto's Advanced Diagnostic bill is still outstanding and also has not been paid.

6.60　Likewise, USAA has failed to accept or deny DiNoto's entire claim, thus necessitating this lawsuit.

6.61　USAA has failed to pay the claim without delay.　As described at length above, delay is USAA's *modus operendi* in PIP claims.　For example, USAA delayed paying Memorial Hermann's bill until it was paid by Medicare. USAA has delayed paying all of the bills described in the proceeding paragraphs. Moreover, it has done so specifically to benefit itself at the expense of its insured.

6.62　Nor has USAA paid the penalty interest now owed on the unpaid PIP benefits.

6.63　Such failures constitute violations of the TEXAS INSURANCE CODE §§ 542.055, 542.056, 542.057, and 542.058. As a result of the forgoing violations, DiNoto request damages under TEXAS INSURANCE CODE § 542.060.

### BREACH OF THE DUTY OF GOOD FAITH & FAIR DEALING – CLAIM AGAINST USAA

6.64　USAA, as DiNoto's insurer, owed DiNoto a duty of good faith and fair dealing.

---

6.65   USAA breached this duty by unreasonably and unfairly delaying and denying payment once liability was reasonably clear. As discussed at length in Section 6, USAA had all of the information needed to promptly and fairly resolve DiNoto's claim in accordance with the law. It refused to do so. Instead, it considered collateral sources, mislead DiNoto, repeatedly sought information it already had to delay payment, and sought information that was irrelevant to assist it in denying payment. Details of these allegations are described in the foregoing paragraphs, and are incorporated herein by reference. Although it was reasonably clear that DiNoto's claims are covered by the Policy, Defendant failed to pay the claims or conduct more than a sham, pretextual investigation with the goal of denying DiNoto's PIP claims. As a result of USAA's breaches of the duty of good faith and fair dealing, DiNoto has been deprived of his PIP benefits, suffered financial hardship from a lack of income replacement benefit, and had medical bills outstanding for years.

6.66   Upon information and belief, this same pattern of unreasonable and unfair claim delay and denial is par for the course for USAA. DiNoto's counsel is personally aware of other USAA insureds who have had similar frustrations with USAA's PIP claims handling. Upon information and belief, there are numerous attorneys in the state of Texas who represent policyholders against USAA in the PIP context and find that USAA's treatment of DiNoto is typical of its treatment of its insureds.

**DECLARATORY JUDGMENT PURSUANT TO TEX. INS. CODE §541.252(2)**

6.67   The facts described above show that USAA and AIS have systematically breached Plaintiffs' insurance policies and violated the TEXAS INSURANCE CODE by

delaying and denying payment, and considering collateral sources. DiNoto, individually and on behalf of the Class, seeks this Court's relief in declaring that Defendants cannot delay, deny, or condition properly submitted PIP claims in the manner described above. Pursuant to TEX. INS. CODE §541.252(2), final injunctive relief of this nature is appropriate, respecting the Class as a whole.

## VII. ATTORNEY'S FEES

7.01    As a result of Defendants' conduct, Plaintiffs have been forced to retain an attorney to seek justice in this Court. Accordingly, Plaintiffs are entitled to recover reasonable and necessary attorney's fees incurred in this action pursuant to TEX. CIV. PRAC. & REM. CODE §38.001, DTPA §17.50(d), and TEXAS INSURANCE CODE §541.152.

## VIII. DAMAGES

8.01    Plaintiffs are entitled to the following:

      (a)    Their wrongfully denied PIP benefits;

      (b)    Penalty interest of 12% under TEX. INS. CODE §1952.157;

      (c)    Additional damages as the trier-of-fact determines under TEX. INS. CODE sections 541 and 542 including but not limited to treble damages and statutory interest;

      (d)    Economic damages;

      (e)    Mental anguish damages;

      (f)    Exemplary damages;

      (g)    Pre-Judgment interest, Post-Judgment Interest and Costs of Court; and,

      (h)    Attorney's fees.

## IX. JURY DEMAND

9.01    Plaintiffs demand a trial by jury and have tendered the appropriate fee.

## PRAYER

Wherefore Plaintiffs pray that USAA and AIS be cited to appear and answer herein and that upon final hearing they be awarded their just economic damages, actual damages, statutory interest penalties, treble damages, exemplary damages, mental anguish damages, additional damages, pre-judgment and post-judgment interest, attorney's fees, cost of court and such other relief as they may show themselves entitled. As required by Rule 47(b), TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs' counsel states that the damages sought are in an amount within the jurisdictional limits of this Court. As required by Rule 47(c), TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs' counsel states that Plaintiffs seek monetary relief, between $50,000,000 and $1,000,000,000. The amount of monetary relief actually awarded, however, will ultimately be determined by a jury.

Respectfully submitted,

**WYLY & COOK, LLP**

By:  /s/ Brad Wyly
Brad T. Wyly
State Bar No. 24042198
Federal Bar No. 37505
4101 Washington Ave.
Houston, Texas 77007
(713) 236-8330 Telephone
(713) 863-8502 Telefax
bwyly@wylycooklaw.com
*Attorney-in-Charge for Plaintiff and the Putative Class*

JOSH DAVIS LAW FIRM

By:     /s/ J.P. Davis
Joshua P. Davis
State Bar No. 24055379
Federal Bar No. 1109971
1010 Lamar, Suite 200
Houston, Texas 77002
(713) 337-4100/Phone
(713) 337-4101 /Fax
josh@thejdfirm.com

*Of Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing has been was served on all parties and/or counsel of record via ECF in accordance with the FEDERAL RULES OF CIVIL PROCEDURE on November 3, 2013 as follows:

P. Wayne Pickering
Leticia P. Aguilar
MARTIN, DISIERE, JEFFERSON & WISDOM, LLP
808 Travis Street, 20th floor
Houston, Texas 77002

Marci A. Eisenstein
Jay Williams
David C. Scott
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606

Richard Glenn Foster
Raj Aujla
PORTER ROGERS DAHLMAN & GORDAN, P.C.
745 E. Mulberry Ave., Suite 450
San Antonio, Texas 78212

          /s/ J. P. Davis
Joshua P. Davis